Ms. Karp, you have reserved 2 minutes for rebuttal, so that gives you 8 out of 8. Thank you. Good morning, Your Honors, and may it please the Court. Meredith Karp of Simpson Thatcher & Bartlett retained last week as pro bono counsel to argue the appeal on behalf of Plaintiffs Appellate's American Choice Veterans Construction Inc., which I'll refer to as ACVCI, Andreas Plaza, and Elizabeth Eunice. This case is about a concerted effort by Defendants Perna and Wasserman to enact a sewer service scheme with the necessary assistance and cooperation of New York City Marshal Edward Guida that deprived plaintiffs of their 14th Amendment right to due process. This scheme also sought to severely damage Plaintiff Eunice and Plaza's ability to run their business, ACVCI, and ensured that ACVCI could not compete for bids against the company they formed, which was USAVBI, which operated in the same market. The Defendant's conduct as plausibly pled in Plaintiff's First Amended Complaint violates Section 1983 and the Sherman Act, as well as a variety of state laws. The District Court erred in granting Defendant's right to due process. So there was a post-deprivation process in place, and it worked, right? They got their money back? The judgments were vacated? Your Honor, I submit that it did not work, and that there should have been a pre-deprivation process. Were the default judgments vacated? The default judgment for Ms. Eunice was vacated, and yes, the default judgments were vacated. Ms. Eunice did receive. They got their money back with interest? They got their money back that was in the account with interest. However, as alleged in the First Amended Complaint, there were several additional harms that were not redressed by that post-deprivation process. And I'll take a step back and focus then on the divide between whether there is established state procedure or claims based on random and unauthorized acts by state employees, since Your Honor's question assumed, as the District Court found, that the act of the Marshall-Gida was based on an unauthorized and random act versus an established state procedure. So I'll start with established state procedure, and then I'll go to the second. Judgments are entered and executions are issued all the time? I mean, are you suggesting that there should always be a pre-deprivation hearing before judgment can be entered and execution is issued? I'm not suggesting that that is always the case. I do believe that when claims are based on established state procedures, so long as it also meets the factors set forth in Matthews v. Eldridge, then you do need pre-deprivation process. And with respect to random unauthorized acts by state employees, there, I submit to you that there is an intra-circuit split of sorts, where certain courts in the Second Circuit have held that it's per se, there's a bright-line rule, to the extent that claims are based on random unauthorized acts by state employees, then necessarily post-deprivation process is enough. However, there are other cases in the Second Circuit, and they stem from the Peratt case in the Supreme Court, that says that you don't immediately jump to whether post-deprivation process was enough, that you must decide whether it was practical or impossible, or there was... So, Ms. Karp, how was it practical, then? In these facts, how was it practical for the state to have predicted or anticipated this deprivation, and been able to provide pre-deprivation due process? Sure. So, the analysis under Peratt is that if there was no necessity for quick action, and doing so would not have been impractical, then pre-deprivation process is required. And under the complaint, as alleged here, Eunice, the plaintiff, reached out to Geeta, the marshal, roughly on September 26th of 2023, after she learned that her account was frozen. It was at that time, right, that the plaintiff learned of the default judgment that had been entered a month earlier, and Eunice told Geeta that she would seek an appeal. She then sought an appeal... Did Geeta actually advise Eunice to even go to court and get relief? It is alleged in the complaint that Geeta did advise Eunice that those were steps that she could take. However, nearly one month later, on roughly... And an appeal, based on that advice after that conversation, as alleged in the complaint, was scheduled for November 9th, 2023. So she learns at the end of September, and then a hearing is scheduled for November 9th. But in between that time, roughly on October 19th, 2023, Teachers Federal Credit Union, the bank, nonetheless withdrew all but $1 from Eunice's account and set the funds aside for the marshal, Geeta. And that affected the deprivation. And further, even though it was alleged in the complaint that Geeta knew that the plaintiff had a hearing scheduled for November 9th... So the money was withdrawn in October, and then the account was unfrozen a month later? No. No?  So there's... So there's... And I agree that the timeline is a bit confusing. So yes, she files an order to show cause in October. Geeta disburses the funds. And just to complete the fact pattern for November 9th, the complaint alleges that that very morning, when the hearing was to occur, that Geeta disbursed the funds from Perna's accounts to Defendant Wasserman. So TFCU had set aside the funds in October, but the very morning of the hearing where Geeta was going to... Where Eunice was going to challenge it, the funds, Geeta sets them aside and actually disburses them to Wasserman. So then the hearing is held... Ms. Clark, just one moment. Before the default judgment was entered, could the state have provided any pre-deprivation due process? So you're talking about kind of what happened after the default judgment, but before the default judgment was entered, could the state have predicted the deprivation? Because that really is the... Was the... Based on your alleged facts, the start of the deprivation, correct? And so what could the state have done? How could the state have predicted before the default judgment? So before the default judgment, and then we're in the land that you're talking about now, right? How is it based on established state procedures? And we allege in the complaint, and we argue in our papers, that because the city of New York had policies that allowed the separate entity rule to be violated, and so that under that rule, under New York law, you have to execute the judgment either in the main branch of a bank in New York City, and New York City Marshals have to do that, or at the branch where the party actually has an account. And so the view here is... And also that the city does not adequately train its New York City Marshals to be aware of conflicts of interest and following the separate entity rule. And so the argument there is that it was foreseeable because the city has these customs and practices in place that sort of allow these violations to occur, that there should be process that could happen beforehand, but I do acknowledge your point that it is a harder argument from step one of this alleged scheme than step two once the accounts are frozen. Do you want to address the antitrust claim? I'll address it briefly. So the complaint adequately alleges an antitrust agreement or conspiracy among legally distinct entities, KERNA, Wasserman, EDA, and USA VBI, to use defendant's sewer service scheme to prevent ACVCI from submitting... The antitrust laws protect competition, not competitors. Does the complaint allege harm to competition as a whole? Yes, it does. We submit that the complaint adequately alleges bid rigging and where a practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, then it is per se illegal. Do you have a case that says that? Yes, that's... This is a situation where this is a two-party dispute, and so it would seem to me that any dispute involving competitors is going to be now turned into an antitrust case. I do not submit that that is the law, Your Honor. The case that I cite for that is Broadcast Music v. CBS, Supreme Court case from 1979, and with respect to a two-party case, I do believe that's what the district court found. The district court found that this was a two-party case, but I don't... I believe that's jumping and making a factual inference that is not pled, that Perna and Wasserman were found by the district court to be officers of the entity USAVBI, but that's not pled. It's pled in the complaint that they established that entity. It's nowhere pled that they are one in the same and that they're all one unit. They established it. That sounds like they did it together. I believe that I will submit that the complaint alleges that at the jump, they established it. In the present day, when the alleged bid rigging is occurring, it's nowhere pled in the complaint that they are one single entity. So, Ms. Carp, let's just assume, arguendo, that there was an injury. I mean, is this an antitrust injury? How is it an antitrust injury? As it goes to antitrust standing. Yes. So, I would say that I do believe discovery is the appropriate next step so that this could be further compared. But what I went to in the beginning with bid rigging, if because ACVCI was not allowed to make a bid, there's one bid in particular that's mentioned in the complaint. They were, it is undisputed, that they were not able to make that bid. Here... Well, wouldn't that be incidental injury? And so the antitrust injury really would go to the agencies that had requested the bids, right? So, they would be the parties that would incur the antitrust injury. Yes. So, I would say to that, Your Honor, I absolutely understand and take the point. I do think there's a fact issue and proceeding under the rule of reason where courts examine both the positive and negative effects of an agreement before determining whether there's a violation of the antitrust laws, which would include considering the business purpose agreement, the market power, the parties involved, competition within the relevant market, and other circumstances, would be the appropriate next step here. I'm not sure that's the next step here. I mean, you have to allege facts that there has been an antitrust injury, that there's been a harm to competition. It seems to be all, what you're saying is that any time there's harm to a competitor, there is per se harm to competition. What I'm saying here, Your Honor, is that USAVBI secured a contract that was valued at approximately $1.5 million from the New York State Office of Parks, and ACVI was unable to bid on this project because of the defendant's actions, and I'm relying on bid rigging, as I mentioned before. Well, you're reserved a couple minutes for rebuttal. Thank you. You're from the city, right? You're from Saddrey? Am I pronouncing that right? Yes. Okay. Good morning. Good morning. Taha Saddrey appearing on behalf of the city of New York. To start, this complaint only alleges city liability for Guida's actions in executing the default judgments. So the question that is presented is, one, whether or not plaintiff has plausibly alleged that anything that the marshal did caused a deprivation of property without due process, and two, whether plaintiffs have plausibly alleged that a policy or practice of the city of New York could be said to have caused that violation under Monell. And the city's position is that plaintiff's claims against the city fail for a host of  Well, I mean, I guess if there's no violation because there was sufficient due process, then we don't even get to the Monell claim, right? Yes, that is true. But the Monell claim is simple because there is clearly no actionable policy or practice alleged under that, you know, that could establish city liability under Monell, and that would be dispositive of the whole thing. But it is true that the process that was available to plaintiffs was adequate. I mean, there is the ample process is available prior to the entry of judgments and then in the course of the execution of judgments. And in this particular case, plaintiff had the opportunity for process prior to the disbursement of her funds. The complaints allegations established that units If they weren't given notice because the summons was misaddressed, how would they have process before the entry of judgment? Well, what I'm saying is that in terms of the process that is provided by law, then the plaintiffs who are seeking the judgment are required to make a showing before a judge that they have served and that they have a meritorious claim. Well, the defendant wouldn't have the ability to participate in that process if they did not have notice. Yes, that is correct. But that would be a failure by the plaintiffs and the parties seeking the judgment to accurately notify the court. Why don't you address process post-judgment? So post-judgment, Eunice acquired actual knowledge of the fact that the judgment had been entered and was notified by Guida of the availability of a process to seek vacatur of the judgment before the funds were disbursed. And she successfully used that process in Perna's action to obtain a stay of the execution of the default judgment in her case. But in Perna's case, it didn't prevent the disbursement of funds because she didn't bring a petition in Wasserman's case. So, Ms. Sedgwick, what were some of the other available remedies that perhaps they didn't use? Here, they filed a board of additional cause, the case was reopened, and they were able to obtain the vacatur of the default judgments. But were there other available remedies to them, whether it be through state tort claim or an appeal? What other? Yes, well, I mean, they could have. I mean, the thing is, they could have sought vacatur of the default judgment in Wasserman's case prior to the disbursement. The failure to do so was due to what plaintiffs allege was a bureaucratic error on the part of the court. And so this is not something that is attributable to the city. And then afterwards, she was able to successfully obtain the vacatur and was able to reach the return of funds to the extent that there are other, I mean, there were other. And so the process protected the deprivation, against the deprivation of property. I mean, to the extent that there are other, that there were other harms separate and apart from the process associated with the deprivation of property, that was something that, yes, plaintiffs could seek redress through other kinds of tort state actions, both within the Article 52 and separate tort actions. But, you know, that doesn't go to, you know, whether or not adequate process was provided here. And it certainly doesn't go to whether or not the city is liable for any failure of process. Again, the standard in a Monell claim is when it's based on, you know, failure of training or supervision is to establish that there was an actionable process where there was, I'm sorry, deliberate indifference to the likelihood that violations would occur. And here, I mean, it seems that this is isolated actions. Thank you. Thank you. We'll now hear from Mr. Klein on behalf of the individual defendants. Good morning. May it please the Court. Israel Klein, Pardalis, Novica, on behalf of the appellees Edward F. Guida, Albert Perna, and Grant Wasserman. There is no due process violation in this case, Your Honors. There were adequate post-deprivation remedies available here, and in fact the appellants availed themselves of those remedies even before any funds were actually taken out of the account with respect to the Perna matter, and the Wasserman, they could have availed themselves of those remedies. This case is not dealing with an issue of established state procedures. There is clear established state procedures providing notice and opportunity to be heard with serving the complaint, notice of the complaint, having an action. In this case, the allegations are solely on random and unauthorized acts, whereas there's some conspiracy to not provide adequate notice to gain some benefit with respect to Marshall Guida, which is not really alleged in this action, Your Honors. Given that there's random and unauthorized action here, the state could not have anticipated any issue or provided a hearing or opportunity to be heard pre-deprivation. So on the one hand, you argue that what Guida did was random and unauthorized, but on the other hand, you argue that he had no choice but to serve the execution. That doesn't sound like random and unauthorized. How do you square those two? Yes, Your Honor. The allegations taken as true would implicate a random and unauthorized action. But Marshall Guida was obligated, required to follow the law. Under the CPLR, he has no discretion to say I'm not going to enforce this judgment because it's questionable. That would open a can of worms, and any judgment issued by any court, you know, would have issues with enforcement procedures. So Marshall Guida was simply following the law. And, in fact, in this case, he notified the appellants of the judgment, and he actually said per the amended complaint in the complainant's pleas that Marshall Guida said, go to court and challenge this. So certainly there was notice before any funds were taken, and he was just doing – he has no discretion. He was just doing what he's required to do. But arguendo that there was some massive conspiracy, then by definition of that conspiracy, it has to be a random and unauthorized action. That's not the procedure established by the state. The state doesn't have established procedures where marshals are supposed to give improper notice and condone the improper notice. When we talk about an issue with established state procedures, we're talking about sham review proceedings or no review proceeding before there's a taking. The procedure set forth here has proper hearings and opportunity for that. And just to quote Peratt, Your Honors, the usual rule has been where only property rights are involved, mere postponement of a judicial inquiry is not a denial of due process. If the opportunity given for ultimate judicial determination of liability is adequate, there has to be a hearing before a final deprivation. And there certainly was a hearing in this case. There was a hearing that ultimately vacated the default judgments, ultimately saw return of the funds with interest. And the Supreme Court in Hudson v. Palmer extended the Peratt ruling to intentional misconduct, which is alleged in this case. And Hudson said the underlying rationale of Peratt is that when deprivations of property are affected through random and unauthorized conduct of a state employee, pre-deprivation procedures are simply impracticable, since the state cannot know when such deprivations will occur. And with respect to any errors by the bank with sending notices out, Your Honors, that would be at best a negligent action, which would be covered under Peratt again with random and unauthorized conduct. Mr. Klein, can you address the antitrust? Certainly, Your Honor. So as was stated here previously, Your Honor, antitrust laws protect competition, not competitors. Then that would give rise to an antitrust claim and any breach of contract claim with two competitors in the same industry. There would be no end, no bright line rule for when that would apply and when that wouldn't apply. Here, there is no allegation that any action here infringed on competition. The allegation is bid rigging, that the bid rigging hurt competition. How do you respond to that? Well, again, it's not pleaded exactly how that would have affected competition. It's also unclear to me what conspiracy would have been alleged. As this report found, there was no adequate conspiracy between two separate distinct entities here that would give rise to an antitrust claim. So Ms. Clark had discussed during some questions antitrust standing. And so who is the efficient enforcer here with respect to antitrust standing? Well, there wouldn't be any antitrust standing in this instance, Your Honor, because under the intercorporate conspiracy doctrine, there aren't two separate distinct actors here. So, you know, standing in an antitrust claim would be, you know, a conspiracy by two entities, perhaps, to affect the end user, the consumer, to, you know, have the benefit of competition in that industry. All right. Thank you, Mr. Klein. Thank you, Your Honors. We'll now hear from Ms. Clark for two minutes at a go. Thank you very much. Just a few points. Based on what counsel just said, if Marshall Guida was obligated to enforce a judgment that he knew was invalid on its face no matter what, no discretion, then that is an established state procedure. Okay. But if there's no due process violation to begin with, in other words, the ability to get your money back and interest in the state court is sufficient, then we don't really care about Marshall Guida, right? I don't think it's sufficient. So your view is that there is a due process claim against Guida, regardless of whether or not the state proceeding is sufficient. So I do want to clarify one thing on the timing here, based on some questions with Judge Vaca earlier. So, yes, it may be difficult before the default judgments were entered to have a hearing under these circumstances. But under the scheme alleged, the deprivation happens when the funds are frozen, and then it's completed when the funds are removed and provided to the defendant in this action. And there was no hearing. There was no process before that final deprivation. So I just wanted to clarify that. I did want to talk about remedies as well. Under Plymouth 2, which is cited in the papers and in the district court opinion, there are no state remedies under Plymouth. The only option is 5240. Here, the district court inappropriately held that New York Code Sections 5239 and 5240 provided adequate post-deprivation process. But 5239 isn't relevant because it only authorized judicial action prior to the application of property or debt. And here, the plaintiffs weren't aware of the deprivation until it was underway. And that's the timing with respect to what I was just talking about earlier. But why doesn't interest cover that? So interest covered, we allege in the complaint, a number of other harms. And these are harms that are recovered. There's compensatory damages and punitive damages are also recoverable under 1983. Those other harms are she lost her apartment, her credit rating was torched, she had to sell her wedding ring, she suffered emotional distress. Those are additional harms that were not covered by the return plus interest. How much was frozen? $4,000, $5,000? Somewhere between $4,000 and $10,000. And all of those horrors resulted from the freezing of $4,000? As alleged, $12,000, thank you. As alleged in the complaint, and I can probably find, I think it's maybe 39, all of those harms do flow from that. Because if you're not able to make your rent, if you're not able to do that, and these are harms that have been recognized in other cases as well. And just, yes, it's paragraph 39 of the complaint. She was forced out by her landlord. She could not pay her bills and sustain late fees. She suffered irreparable damage to her credit rating and the like. All right, thank you. Thank you. We will reserve the decision.